UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Acoustic Technologies, Inc., )<br>)<br>    *Plaintiff,* )<br>        v. )<br>Itron, Inc. )<br>)<br>    *Defendant.* )<br>_____ ) | C.A. NO.<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

## THE PARTIES

1. Plaintiff, Acoustic Technology, Inc. ("ATI"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts and maintains its principal place of business at 30 Jeffries Street, East Boston, Massachusetts.

2. ATI is a systems integrator and hardware and communications systems designer. It designs, manufacturers and supplies, *inter alia*, devices that route or relay data over communications networks synonymously referred to as concentrators, relays or routers, sirens and complex warning and notification systems. ATI's customers include state and regional governments, the military and public utilities.

3. Upon information and belief, defendant, Itron, Inc. ("Itron"), is a corporation organized and existing under the laws of the State of Washington and maintains its principal place of business at 2111 N. Molter Road, Liberty Lake, Washington.

4. Upon information and belief, Itron is a technology provider to the global energy and water industries, providing metering, data collection and utility software solutions.

5. Itron is duly registered to conduct business as a foreign corporation in Massachusetts, maintains a regular place of business in Boston, Massachusetts, and on

information and belief engages in continuous and systematic sales efforts and derives substantial revenue from business in Massachusetts.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this Complaint because it contains claims for patent infringement under 28 U.S.C. § 1338(a) and under 28 U.S.C. §1331. It also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

7. Venue is proper under 28 U.S.C. §1400.

## FACTS COMMON TO ALL COUNTS

A. **The Development of Automated Meter Reading Systems**

8. Public utilities charge their customers based on the amount of energy or water they utilize. They generally measure energy or water consumption through meters installed at their customers' homes or businesses.

9. Billing customers was labor intensive because public utilities were required to employ meter readers to visit each customer's home or business periodically to read the meters and then report this information to the utility's billing department.

10. For years, utilities sought means of automatically reading customer meters and transmitting these readings to their billing system ("AMR system").

11. Utilities also became interested in AMR systems to provide additional services to customers, such as communicating time of use information and outage/restoral monitoring, and even expanding their services to include transmission of voice and data communications in competition with telephone, cable, cellular and satellite companies.

12. Prior to 1997, consideration had been given to utilizing electric utilities' existing transmission networks to support an AMR system by transmitting data over existing electric transmission wires, but the hurdle presented by the inability to reliably transmit large amounts of data through voltage transformers (utilized to step down voltage on the network) could not be overcome.

13. With the advent of cellular technologies, consideration was given to using cellular devices to communicate data for AMR systems, but it was not practically possible, particularly given the nature of the technology at that time, to install at every customer location a cellular communication device with the power necessary to transmit data to a central location.

14. In or about 1994, non-party, PECO Energy Company ("PECO"), began development of a customer communication platform encompassing a two way AMR system. PECO designed a system in which a number of meters would be grouped together and communicate with a concentrator that would relay data between the meters and a central computer or control device.

**B.    PECO Engages ATI to Invent an AMR System**

15. In or about December 1996, PECO consulted ATI to assist in overcoming technical difficulties it was encountering with the design of the AMR system it was designing.

16. ATI finalized the design of an AMR system with the functionality PECO sought. This design included, what ATI termed, a "concentrator meter" which its President, Reada Bassiouni invented while acting within the course and scope of his duties with ATI. All of Bassiouni's rights in the concentrator meter were assigned to ATI.

17. As conceived by ATI, the concentrator meter would house within the same device a meter and a relay to transmit data between groups of meters and a central computer control device over local area network ("LAN") and/or wide area ("WAN") network.

18. By Research and Development Agreement dated March 13, 1997, PECO engaged ATI to develop a detailed design of and specifications for the AMR system it had created, including the concentrator meter (and a PLC insert) ATI had conceived.

19. By the second half of 1997, ATI had designed and developed specifications for a two way AMR system that included a "concentrator meter" which served the dual function of measuring the usage and relaying data between defined groups of meters and a central computer. The concentrator meter's communications with the meters were short range and to be transmitted over power lines (because the data would not be required to be transmitted through transformers). The communications with the central device were designed to be over a wide area network ("WAN").

20. ATI also designed an alternative AMR systems in which: (i) the relay between the meters and central computer or control device would contain a code-division multiple access (CDMA) communication link for carrying data and would communicate with the meters and/or central computer through this link; (ii) the metering device and central computer would communicate.

21. On or about September 9, 1997, ATI and PECO executed an "As Sold Scope of Services, Understanding and Contractual Agreement" (the "Production Agreement") for ATI to develop the final technical specifications for the two way AMR system and produce production models of a concentrator meter and PLC insert.

22. While ATI was engaged in the development and production work specified in the Production Agreement, PECO decided to acquire an AMR system from a third-party and sought to terminate the Production Agreement.

23. The parties ultimately executed a Settlement Agreement dated September 28, 1999 in which, *inter alia*, ATI agreed to complete and deliver certain development deliverables under the Production Agreement to PECO and PECO agreed to make a compromise payment to ATI.

24. In paragraph 4 of the Settlement Agreement, it was agreed that "ATI and PECO shall each retain and equally share exclusive rights and title to all intellectual property developed by ATI pursuant to the September 9, 1997 contract [the Production Agreement], including the Development Deliverables (the Contract IP)."

25. Paragraph 7 of the Settlement Agreement provided that "[a]t the time of Settlement Payment by PECO the Parties will execute mutual releases. Upon the execution of mutual releases, the Original Contract [Production Agreement] shall be terminated and, except as provided in this Agreement, neither Party thereto shall have any rights or obligations thereunder or with respect thereto.

26. On or about March 2000, in accordance with the terms of the Settlement Agreement, the parties executed a General Mutual Release Agreement.

27. As of the execution of the General Mutual Release Agreement, any rights or interest PECO was granted in ATI's designs and inventions, including the concentrator meter, other than the right to sell or license the use of the final specifications and actual production models of the concentrator meter and PLC insert, was extinguished.

C. **PECO Files Patent Applications upon ATI's Inventions**

28. However, unknown to ATI at the time the General Mutual Release was executed, PECO had previously caused a patent application to be filed upon a "System and Method for Communication between Remote Locations," claiming upon a system and methods for providing automated meter reading consisting of: (i) a control means; (ii) a plurality of metering devices arranged into a defined number of metering groups, with each meter containing means of communicating data associated with an amount of usage of a utility; and (iii) a defined number of relays, with each such device being networked with the control means and one or more metering groups and having the capacity to exchange data between the control means and the metering group (the "October Application").

29. The United States Patent and Trademark Office ("PTO") initially rejected the October Application on the grounds of prior art.

30. PECO amended the October Application to add a concentrator meter to the claims upon the two way communication system and to claim separately upon a concentrator meter.

31. PECO filed three continuations of the October Application.

32. On November 16, 1999, the PTO granted the October Application on the basis that the addition of the concentrator meter distinguished the claims from the existing prior art. The PTO issued Patent No. 5,986,574 (the '574 Patent") covering "A System and Method for Communication between Remote Locations." A true and correct copy of the '574 Patent is attached hereto, made a part hereof and marked Exhibit "A."

33. The PTO subsequently issued Patents 6,239,722 (the '722 Patent") and 6,509,841 (the '841 Patent") (collectively the "Continuation Patents") as continuations of the '574 Patent.

34. As a general matter, the '841 Patent claims upon a remote two way communication system between a control (including a central computer) and a service device, including a meter, for measuring a local parameter through a code-division multiple access ("CDMA") communication link. A true and correct copy of the '841 Patent is attached hereto, made a part hereof and marked Exhibit "B."

35. In Claim 8, the '841 Patent claims upon "A system for remote two-way meter reading comprising: a metering device comprising means for measuring usage and for transmitting data associated with said measured usage in response to receiving a read command; a control for transmitting said read command to said metering device and for receiving said data associated with said measured usage transmitted from said metering device; and a relay for code-division multiple access (CDMA) communication between said metering device and said control, wherein said data associated with said measured usage and said read command is relayed between said control and metering device by being passed through said relay."

### D. ATI Establishes Its Rights in the Patents

36. After it learned of the Patents, ATI filed a Demand for Arbitration against PECO with the American Arbitration Association seeking, *inter alia*, a declaration that the '574 Patent and Continuation Patents claim upon intellectual property ATI developed.

37. By Award dated November 8, 2004, the sole arbitrator, the Honorable John J. Gibbons, former Chief Judge of the United States Circuit Court of Appeals for the Third Circuit, declared that ATI invented the concentrator meter and the AMR systems claimed in the '574 Patent and the Continuation Patents. A true and correct copy of the Arbitration Award is attached hereto, made a part hereof and marked Exhibit "C."

38. The arbitration award established ATI's ownership of the '574 Patent and Continuation Patents and ATI's right to enforce the patents.

39. In an Intellectual Property Rights Agreement executed after the Arbitration Award, PECO, CIC Global (an entity to which PECO had issued void licenses of the Contract IP and patents) and ATI "release[d], remise[d] and discharge[d] each other from the limitations set forth in paragraphs 4 and 5 of the Settlement Agreement on their right to assign and license Contract IP . . ." and furthermore agreed PECO and Global shall not be entitled to any proceeds from the sale, assignment, license or other transfer by ATI after the date of this Agreement of an interest in the Contract IP.

40. Upon learning that Itron was involved in the sale and installation of AMR systems, ATI advised Itron of the claims disclosed in the '574 Patent and the Continuation Patents and offered to license the right to produce, sell and install the AMR systems, concentrator meter and/or relays disclosed therein.

41. Itron entered into discussions with ATI of a license which it subsequently terminated claiming that it was developing its own automated meter reading system that incorporated a different technology.

E. **Itron's Infringement of the Patents**

42. Contrary to this statement, upon information (including defendant's public disclosures) and belief, Itron has produced, marketed, sold and installed an AMR system in which: (i) meters containing a means of measuring and communicating the amount of usage of a utility are grouped together and formed into local area networks; (ii) each of the meters within a group transmits to and receives data and instructions from one or more concentrators; and (iii)

the concentrators relay information between the groups of meters and a central computer or control device over a wide area network.

43. Upon information and belief, in a standard configuration of Itron's AMR system, the concentrator, what Itron calls its Open Way Cell Relay Meter, is contained within the same housing or unit as the means for monitoring and communicating the usage of a utility, and contains means for communicating over a local area network with the meters in its group and over wide area network with a central computer or other control device.

44. Upon information and belief, Itron has manufactured, marketed, sold and delivered the constituent parts of its AMR system, including the relay (concentrator) meter, to utilities in the United States.

45. Upon information and belief, Itron has sold or licensed the use of its AMR system incorporating the use of relay (concentrator) meters to utilities in the United States, which were installed either by Itron, the utility or a third-party.

46. Itron's AMR system and OpenWay cell relay (concentrator) meter infringe the '574 Patent and the production of the relay meter, sale and installation of these devices and the license, sale and installation of Itron's AMR system infringe the '574 Patent.

47. In addition, Itron markets the OpenWay AMR system in which the OpenWay relay, whether included in the meter or pole mounted, contains a CDMA communication link for communicating with the central computer or other control device, there is two-way communication between the metering devices and the central computer or other control device and the metering devices provide information in response to a command or direction from the central computer or other control device.

48. Itron promotes its alternative OpenWay AMR system as supporting utilities' access to energy usage data and advancing their smart grid projects.

### COUNT I
### PATENT INFRINGEMENT

49. ATI incorporates by reference, as if fully set forth herein, paragraphs 1 through 48 of this Complaint.

50. Itron has infringed the '574 Patent by designing, marketing, selling, licensing the use of and/or installing AMR systems claimed in the '574 Patent and/or containing devices claimed in the '574 Patent.

51. Itron has contributed to the infringement of the '574 Patent by designing, selling, licensing the use of or supplying the equipment for AMR systems that utilities have installed, or caused to be installed, which infringe the claims of the '574 Patent and/or contain devices claimed in the '574 Patent.

52. Itron's infringement and/or contributory infringement of the '574 Patent has been willful and deliberate, and in disregard of plaintiffs' lawful rights, rendering this case "exceptional" under 35 U.S.C. § 285.

53. Itron continues to infringe and/or contribute to the infringement of the '574 Patent by designing, marketing, selling, licensing the use of and/or installing AMR systems which are covered by claims and/or contain devices claimed in the '574 Patent.

54. As a direct and proximate result of Itron's infringement and contributory infringement of the '574 Patent, ATI suffered and continues to suffer irreparable harm and serious and substantial injury, for which there is no adequate remedy at law.

55. As a further direct and proximate result of Itron's infringement and contributory infringement of the '574 Patent, ATI has suffered monetary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

WHEREFORE, plaintiff, Acoustic Technology, Inc., demands judgment in its favor and against defendant, Itron, Inc., for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), an award of attorneys' fees and costs, permanent injunctive relief and such other relief as this Court deems just and proper.

## COUNT II
## PATENT INFRINGEMENT

56. ATI incorporates by reference, as if fully set forth herein, paragraphs 1 through 55 of this Complaint.

57. Itron has infringed and/or contributed to the infringement of the '574 Patent by designing, marketing, selling and/or installing OpenWay relay (concentrator) meters as part of its AMR system, which such devices are claimed in the '574 Patent.

58. Itron's infringement and contributory infringement of the '574 Patent has been willful and deliberate, and in disregard of ATI's lawful rights, rendering this case "exceptional" under 35 U.S.C. § 285.

59. Itron continues to infringe and/or contribute to the infringement of the '574 Patent by designing, marketing, selling and/or installing the aforementioned OpenWay relay (concentrator) meter.

60. As a direct and proximate result of Itron's infringement and contributory infringement of the '574 Patent, ATI suffered and continues to suffer irreparable harm and serious and substantial injury, for which there is no adequate remedy at law.

61. As a further direct and proximate result of Itron's infringement and contributory infringement of the '574 Patent, ATI has suffered monetary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000) exclusive of interest and costs.

WHEREFORE, plaintiff, Acoustic Technology, Inc., demands judgment in its favor and against defendant, Itron, Inc., for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), an award of attorneys' fees and costs, permanent injunctive relief and such other relief as this Court deems just and proper.

## COUNT III
## INDUCEMENT TO INFRINGE PATENT

62. ATI incorporates by reference, as if fully set forth herein, paragraphs 1 through 61 of this Complaint.

63. Itron actively induced others to infringe the '574 patent by manufacturing, selling and/or supplying the components for AMR systems that utilities have installed in their territories which are covered by, and/or contain devices claimed in, the '574 patent.

64. Upon information and belief, Itron continues to induce infringement of the '574 patent by manufacturing, selling and/or supplying the components for AMR systems that utilities have installed, or caused to be installed, in their territories which are covered by, and/or contain devices claimed in, the '574 patent.

65. Itron's inducement of the infringement of the '574 Patent has been willful and deliberate, and in disregard of plaintiffs' lawful rights, rendering this case "exceptional" under 35 U.S.C. § 285.

66. As a direct and proximate result of Itron's inducement of the infringement of the '574 Patent, ATI suffers and continues to suffer irreparable harm and serious and substantial injury, for which there is no adequate remedy at law.

67. As a further direct and proximate result of Itron's inducement of the infringement of the '574 Patent, ATI has suffered monetary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

WHEREFORE, plaintiff, Acoustic Technology, Inc., demands judgment in its favor and against defendant, Itron, Inc., for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), an award of attorneys' fees and costs, permanent injunctive relief and such other relief as this Court deems just and proper.

## COUNT IV
## PATENT INFRINGEMENT

68. ATI incorporates by reference, as if fully set forth herein, paragraphs 1 through 67 of this Complaint.

69. Itron has infringed the '841 Patent by designing, marketing, selling, licensing the use of and/or installing AMR systems claimed therein.

70. Itron has contributed to the infringement of the '841 Patent by designing, selling, licensing the use of or supplying the equipment for AMR systems that utilities have installed, or caused to be installed, which infringe the claims of the '841 Patent and/or contain devices claimed therein.

71. Itron's infringement and/or contributory infringement of the '841 Patent has been willful and deliberate, and in disregard of plaintiffs' lawful rights, rendering this case "exceptional" under 35 U.S.C. § 285.

72. Itron continues to infringe and/or contribute to the infringement of the '841 Patent by designing, marketing, selling, licensing the use of and/or installing AMR systems which are covered by claims and/or contain devices claimed in the '841 Patent.

73. As a direct and proximate result of Itron's infringement of the '841 Patent, ATI suffered and continues to suffer irreparable harm and serious and substantial injury, for which there is no adequate remedy at law.

74. As a further direct and proximate result of Itron's infringement and contributory infringement of the '841 Patent, ATI has suffered monetary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

WHEREFORE, plaintiff, Acoustic Technology, Inc., demands judgment in its favor and against defendant, Itron, Inc., for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), an award of attorneys' fees and costs, permanent injunctive relief and such other relief as this Court deems just and proper.

## COUNT V
## INDUCEMENT TO INFRINGE PATENT

75. ATI incorporates by reference, as if fully set forth herein, paragraphs 1 through 71 of this Complaint.

76. Itron actively induced others to infringe the '841 patent by manufacturing, selling and/or supplying the components for AMR systems that utilities have installed in their territories which are covered by, and/or contain devices claimed in, the '841 patent.

77. Upon information and belief, Itron continues to induce infringement of the '841 patent by manufacturing, selling and/or supplying the components for AMR systems that utilities have installed, or caused to be installed, in their territories which are covered by, and/or contain devices claimed in, the '574 patent.

78. Itron's inducement of the infringement of the '841 Patent has been willful and deliberate, and in disregard of plaintiffs' lawful rights, rendering this case "exceptional" under 35 U.S.C. § 285.

79.     As a direct and proximate result of Itron's inducement of the infringement of the '841 Patent, ATI suffers and continues to suffer irreparable harm and serious and substantial injury, for which there is no adequate remedy at law.

80.     As a further direct and proximate result of Itron's inducement of the infringement of the '841 Patent, ATI has suffered monetary damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

WHEREFORE, plaintiff, Acoustic Technology, Inc., demands judgment in its favor and against defendant, Itron, Inc., for compensatory damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000), an award of attorneys' fees and costs, permanent injunctive relief and such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 24, 2010                **ACOUSTIC TECHNOLOGIES, INC.**

By its Attorneys,

/s/Steven W. Kasten
Steven W. Kasten, , BBO # 559576
Noemi A. Kawamoto, BBO # 676870
YURKO, SALVESEN& REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603
Tel: 617.723.6900
Fax: 617.723.6905
e-mail: swk@bizlit.com
         nak@bizlit.com

Of Counsel:   Robert W. Hayes
Cozen O'Connor
1900 Market Street
Philadelphia, Pennsylvania 19103
Tel: 215.665.2094
Fax: 215.665.2013
email: rhayes@cozen.com